UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARILYN EDWARDS,

               Plaintiff,         Case No. 12-11789
                                           Honorable Robert H. Cleland
                                           Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 11]**

Plaintiff Marilyn Edwards ("Edwards") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [8, 11], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Edwards is not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [11] be GRANTED, Edwards' Motion for Summary Judgment [8] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

**II.     REPORT**

    **A.     Procedural History**

On January 23, 2008, Edwards filed an application for DIB, alleging a disability onset date of February 28, 2007. (Tr. 95-102). This application was denied initially on April 24, 2008. (Tr. 50-53). Edwards filed a timely request for an administrative hearing, which was held on July 29, 2010, before ALJ Linda Halperin. (Tr. 31-46). Edwards, who was represented by attorney Mike Lupisella, testified at the hearing. (Tr. 35-45). On September 13, 2010, the ALJ found that Edwards was not disabled. (Tr. 20-27). On April 4, 2012, the Appeals Council denied review. (Tr. 1-3). Edwards filed for judicial review of the final decision on April 20, 2012 [1].

    **B.     Background**

        *1.     Disability Reports*

In a February 6, 2008 disability field office report, Edwards reported that her alleged onset date was February 28, 2007. (Tr. 116). The claims examiner noted that, during a telephone interview, Edwards did not have any difficulty understanding, concentrating, talking, or answering questions. (Tr. 117).

In an undated disability report, Edwards indicated that her ability to work is limited by muscular degeneration/eye disease. (Tr. 120). When describing how these conditions limit her ability to work, Edwards stated, "blurred vision/can't see/have to get someone to help me dust & clean." (*Id.*). Edwards reported that these conditions first interfered with her ability to work on February 28, 2007, and that she became unable to work on that date. (*Id.*). Prior to that, she had not worked since July 1, 2006, when she retired from her job as a machine operator. (*Id.* at 120-21).

Edwards completed high school but had no further education. (Tr. 126). When she

2

stopped work, Edwards was earning $27.00 per hour. (Tr. 121). Her job required her to walk nine hours per day; stand ten hours per day; and handle, grab or grasp big objects ten hours per day. (*Id.*). She was frequently required to lift up to ten pounds. (Tr. 121-22).

Edwards indicated that she had treated with several medical providers regarding her eye impairments, and she was scheduled to have surgery on her right eye in February 2008. (Tr. 123-24). At the time of the report, she was taking several medications, including Crestor (for cholesterol), Dynacirc (for blood pressure), Xibrom (for her eyes), and Zymar (antibiotic eye drops). (Tr. 125). She claimed that the Zymar burned when she first put the drops in her eyes. (*Id.*). She further reported that she had x-rays of her eyes in 2008. (*Id.*).

In a function report dated April 2, 2008, Edwards reported that she lives alone in a condominium. (Tr. 128). When asked to describe her daily activities, Edwards said: "I get up, clean my body, put my wig on, sit down, listen to TV, fix TV dinner in microwave, sit, get up and go to bed." (*Id.*). Prior to the onset of her condition, she was able to exercise, socialize, and drive after dark and on the expressway. (Tr. 129). Her condition interferes with her sleep – she says that when she closes her eyes, she sees images, spots, and demons. (*Id.*). She has trouble getting dressed (she puts clothes on the "wrong side" and "can't match colors"), caring for her hair, and putting on makeup. (*Id.*). She needs help or reminders to put eye drops in. (Tr. 130). She prepares her own meals ("frozen dinners") each day, but does not prepare "full course fresh meals" because she does not want to "burn down [the] house." (*Id.*). She is able to clean her house once a month, but she gets depressed doing so. (*Id.*). She cannot do yard work because dust and weeds affect her eyes. (Tr. 131). She is able to drive, but not after dark or on the expressway. (*Id.*). She goes shopping once a month, and she is able to pay bills, count change, and handle checking and savings accounts. (*Id.*). She has no hobbies. (Tr. 132). She does

3

spend time with others, and she goes to doctors' appointments and to church. (Tr. 132). She has problems getting along with others because she is "depressed" and doesn't want "to be bothered all the time." (Tr. 133).

When asked to identify functions impacted by her condition, Edwards checked lifting, bending, reaching, kneeling, seeing, memory, completing tasks, concentrating, and following instructions. (Tr. 133). She can walk two blocks before needing to rest for ten minutes. (*Id.*). She cannot pay attention for very long, does not finish what she starts, and does not follow written or spoken instructions well. (*Id.*). In addition, she does not handle stress or changes in routine well. (Tr. 134). She has worn glasses, which were prescribed by a doctor, for approximately one year. (*Id.*).

In a disability appeals report dated June 15, 2008, Edwards reported that her condition had worsened since her last report. (Tr. 139). Specifically, Edwards indicated that she was experiencing "severe macular degeneration of eyes." (*Id.*). Since the time of her last report, however, she had not seen any new physicians and was not taking any new medication. (Tr. 140-42). Edwards indicated that she could not "do much because of poor vision." (Tr. 142).

    2.    *Plaintiff's Testimony*

At the July 29, 2010 hearing before the ALJ, Edwards testified that she lives alone in a townhome. (Tr. 37-38). She is divorced and has a twelfth grade education. (Tr. 36). She has a driver's license, but she says that she has problems driving because things are "blurry, like a fog."[1] (Tr. 38). Although Edwards indicated in a disability report that she has trouble seeing when it is dark, she testified that she does drive at night. (*Id.*). She can lift 10-15 pounds, and she is not in pain – her main problem is her vision. (Tr. 40).

---

[1] Edwards further testified, however, that she passed the visual driving test in 2009, and her vision has not deteriorated since that time. (Tr. 38).

In February 2007, Edwards woke up one morning and could hardly see. (Tr. 41). She had suffered an "eye hemorrhage" in her right eye. (Tr. 41-42). At the time of the hearing, her vision was still "foggy" in both eyes (she said she was developing a cataract in her left eye, which affected her vision in that eye). (Tr. 42-43). She is able to do a little bit of reading and "listen" to the television. (Tr. 43). She has trouble walking outside when it is sunny because her eyes "burn a lot." (Tr. 44). She traveled to Atlanta, Georgia, to visit her son, and is able to go shopping with a girlfriend. (Tr. 45). At the time of the hearing, she was taking blood pressure medication and eye drops. (Tr. 44).

### 3.   Medical Evidence

#### (a)   Treating Physician Records

The record contains medical evidence regarding Edwards' eye impairments and her hypertension. There are also some records indicating that Edwards has carpal tunnel syndrome. (Tr. 289-90). These records will be discussed below.

#### (1)   Dr. Ahmed Arif

Edwards treated with her primary care physician, Dr. Ahmed Arif, between 2007 and 2010. As the ALJ noted, Edwards generally saw Dr. Arif for routine physicals and common ailments, such as ear aches and sinus issues. (*See, e.g.,* Tr. 148, 152, 155). Between March of 2007 and the time of the hearing, Dr. Arif was monitoring Edwards' hypertension, but the records indicate that this condition was typically well-controlled with medication.[2] (Tr. 150, 155, 277-86). Indeed, Dr. Arif commented that, with respect to her blood pressure, Edwards was "doing very well when she takes the meds." (Tr. 277).

On February 10, 2009, Edwards first complained of "left hand numbness" that was

---

[2] At one visit, on March 20, 2007, Edwards' blood pressure was not controlled, but she denied chest pain, headaches, or vision changes. (Tr. 152).

5

associated with pain and made worse with repetitive tasks. (Tr. 284). A March 2009 EMG was positive for carpal tunnel syndrome, but it was "mild on the left and minimal on the right." (Tr. 290). There was no evidence of active denervation in either abductor pollicis brevis muscle. (*Id.*). Moreover, in describing her daily activities – both in disability reports and in her hearing testimony – Edwards did not mention any significant limitations with respect to using her hands.

### *(2)   Dr. Robin Ross and Dr. Jeffrey Diskin*

On March 13, 2007, Edwards was referred to Dr. Robin Ross at the Retina Vitreous Center because she experienced a sudden onset of flashing lights and floaters in her right eye. (Tr. 161). After examining Edwards, Dr. Ross' diagnostic impression was probable polypoid choroidopathy with massive subretinal hemorrhage just splitting the temporal fovea of the right eye. (*Id.*). No microaneurysms were detected, and better blood pressure control was recommended (Edwards admitted she had not been taking her blood pressure medication). (*Id.*). She was treated with vitrectomy and intravitreal Avastin injection and, as of April 17, 2007, her vision was slowly improving. (Tr. 162). At that time, her vision was 20/30 in the right eye, with pinhole improvement to 20/25, the hemorrhage was stable and decreasing in size, and no further treatment was needed. (*Id.*).

On May 4, 2007, Edwards complained of pain in the right eye, and she was diagnosed with noninfectious secondary iridocyclitis. (Tr. 163). Topical prednisone was prescribed to treat the inflammation. (Tr. 164). Edwards saw Dr. Ross again on September 6, 2007, and although she reported a small visual field defect, her vision was 20/20. (Tr. 166). Dr. Ross noted that the fact that her vision had improved to 20/20 was "very optimistic," and no further treatment was needed at the time. (*Id.*). Edwards remained generally stable for almost one year post-surgery, but in January of 2008, Dr. Ross noted that she had developed progressive nuclear sclerosis, and

her vision was 20/400 in the right eye with pinhole improvement to 20/40. (Tr. 165). Edwards was diagnosed with a progressive cataract in the right eye and referred to Dr. Jeffrey Diskin of the Michigan Eye Institute for possible cataract surgery. (*Id.*).

On February 7, 2008, Dr. Diskin performed uncomplicated right cataract surgery on Edwards. (Tr. 271-72). On March 10, 2008, however, Edwards awoke with light sensitivity, redness, and mild pain. (Tr. 171). Her uncorrected vision in the right eye was 20/25 with pinhole improvement to 20/20. (*Id.*). The diagnoses at that time were well-treated polypoidal choroidopathy, well-treated juxtafoveal choroidal neurovascular membrane, and pseudophakia with no cystic macular edema. (*Id.*). She was given some eye drops and told to follow up in six months, or sooner if her symptoms continued. (*Id.*).

Generally speaking, Edwards reported improved vision after the cataract surgery. (Tr. 197). In September 2008, her right eye was stable, and she indicated that she was "not bothered by her current vision." (Tr. 214). On October 7, 2008, she reported occasional burning and itching, but cold compresses were helpful. (Tr. 212). She had no pain or discomfort. (*Id.*).

By March 2009, Edwards was reporting progression of a cataract in her left eye, with diminished vision. (Tr. 238). On June 17, 2009, she had cataract surgery on her left eye. (Tr. 259). At a follow-up visit to Dr. Ross in September 2009, Edwards noted intermittent flashing lights in both eyes and a few floaters bilaterally. (Tr. 237). Her vision was 20/30 in the right eye and 20/40 in the left. (*Id.*). She was advised to follow up in six months. (*Id.*). On June 1, 2010, Edwards reported intermittent blurred vision and dry, itchy eyes. (Tr. 236). Her vision was 20/50. Dr. Ross' impressions were: mild posterior capsular opacification, not yet significant enough to warrant YAG capsulotomy; polypoidal choroidopathy with well-treated subfoveal choroidal neovascular membrane; and possible allergic conjunctivitis. (*Id.*).

*(b)     Consultative and Non-Examining Sources*

On April 15, 2008, state agency medical consultant Dr. Russell Holmes completed a physical Residual Functional Capacity ("RFC") Assessment. (Tr. 217-24). In this assessment, Dr. Holmes indicated that Edwards' primary diagnosis was subretinal hemorrhage, and her secondary diagnosis was polypoidal choroidopathy. (Tr. 217). In Dr. Holmes' opinion, Edwards had no exertional, manipulative, visual, or communicative limitations. (Tr. 218-21). However, Dr. Holmes believed that Edwards should be limited to only occasional climbing of ladders, ropes, or scaffolds. (Tr. 219). Dr. Holmes further opined that Edwards should avoid concentrated exposure to vibration; fumes, odors, dusts, gases, and poor ventilation; and hazards (such as machinery, heights, etc.). (Tr. 221). On January 14, 2009, another state agency medical consultant, Jacqueline Flaig, conducted a detailed review of the available medical evidence and affirmed Dr. Holmes' RFC assessment. (Tr. 227-28).

**C.     Framework for Disability Determinations**

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a

> severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Edwards is not disabled under the Act. At Step One, the ALJ found that Edwards has not engaged in substantial gainful activity since February 28, 2007, her alleged onset date. (Tr. 22). At Step Two, the ALJ found that Edwards has the severe impairments of "status post surgical procedures for right eye hemorrhage and bilateral cataracts; and hypertension."[3] (*Id.*). At Step Three, the ALJ found that Edwards' impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 23).

The ALJ then assessed Edwards' residual functional capacity ("RFC"), concluding that she is capable of performing the full range of work at all exertional levels, with the following

---

[3] The ALJ found that Edwards' carpal tunnel syndrome did not constitute a severe impairment. (Tr. 22).

9

nonexertional limitations: she should be required to climb ladders, ropes and scaffolds no more than occasionally, and she should avoid concentrated exposure to vibration, fumes, odors, dust, gases, poor ventilation and hazards such as machinery and heights. (Tr. 23-26).

At Step Four, the ALJ determined that Edwards is unable to perform her past relevant work as a machine operator because it involves regular exposure to machinery. (Tr. 26). At Step Five, the ALJ concluded, based on application of the Medical-Vocational Guidelines, that Edwards is capable of performing a significant number of jobs that exist in the national economy, specifically the full range of work at all exertional levels. (Tr. 26-27). As a result, the ALJ concluded that Edwards is not disabled under the Act. (Tr. 27).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's

decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F. Analysis

Edwards' entire brief is just over three pages long, much of which consists of stock quotes of black letter case law with virtually no analysis or application of the law to the facts of her case. Edwards' "arguments" are both difficult to decipher and largely unsupported, and she apparently leaves it to the court to scour the record for evidence supporting her claims, which is insufficient. *See McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are

deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones.") (internal quotations omitted). Nevertheless, for the sake of completeness, the court will endeavor to identify and address Edwards' arguments.

     *1. The ALJ's Finding that Edwards Has No Exertional Limitations is Supported by Substantial Evidence*

Edwards appears to argue that, in assessing her residual functional capacity, the ALJ erred in concluding that she has "solely non exertional limitations," claiming that she "complained of bilateral carpal tunnel." (Doc. #8 at 7). According to Edwards, the ALJ "failed to consider this disability," which would "make a finding of disability" under the Medical-Vocational Guidelines (the "grids"), 20 CFR Pt. 404, Subpt. P., Appx. 2. (*Id.*). Edwards' assertion is incorrect; the ALJ did consider her complaints of carpal tunnel syndrome and concluded that this impairment did not cause functional limitations. Specifically, the ALJ said:

> A diagnosis of left carpal tunnel syndrome has also been noted, but complaints regarding this are not very frequent or persistent and there is no evidence of resulting functional limitations which persisted for any consecutive 12-month period. Her March 2009 EMG was positive for bilateral carpal tunnel syndrome, but it was mild on the left and minimal on the (dominant) right with no evidence of active denervation in either abductor pollicis brevis muscle. In describing her daily activities, the claimant did not mention significant limitations with respect to using her hands. The claimant's carpal tunnel syndrome is found to be non-severe, causing no more than minimal functional limitations.

(Tr. 22) (internal citations omitted) (emphasis added). Edwards has pointed to no medical evidence in the record suggesting that her carpal tunnel syndrome causes her any functional limitation whatsoever, and the court has not unearthed any such evidence. Nowhere in Edwards' hearing testimony or her disability reports does she assert that she has any limitations with respect to using her hands; indeed, she testified unequivocally that her "main issue" is her vision. (Tr. 40). As such, the ALJ's conclusion that Edwards' carpal tunnel syndrome does not result in

12

exertional limitations is supported by substantial evidence.[4]

### 2. *The ALJ Did Not Err in Applying the Medical-Vocational Guidelines*

In her motion, Edwards also states that ". . . it should be noted there was no vocational expert testimony at the hearing." (Doc. #8 at 7). Edwards' observation in this respect can hardly be characterized as an "argument," particularly when her motion contains no explanation of why vocational expert ("VE") testimony was needed, and no case law establishing, even as a general proposition, that the failure to elicit VE testimony can, under certain circumstances, constitute legal error. Out of an abundance of caution, however, the court will analyze whether, given Edwards' nonexertional limitations, the ALJ erred in failing to elicit testimony from a VE.

As set forth above, if the ALJ determines that the claimant cannot return to her past relevant work, the burden of proof shifts to the Commissioner at Step Five to establish that she retains the RFC to perform specific jobs existing in the national economy. *See Richardson v. Secretary of Health & Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984). The Commissioner can meet his burden by referring to the grids, which dictate a finding of "disabled" or "not disabled" based on the claimant's *exertional*[5] limitations, age, education, and prior work experience. *See Bevelle v. Commissioner of Soc. Sec.*, 2008 WL 5351020, at *10 (E.D. Mich. Dec. 18, 2008).

If, however, an ALJ seeks to use the grids in the face of a *nonexertional*[6] limitation, he or

---

[4] In a sentence that was only half finished, Edwards makes a fleeting reference to "poorly controlled blood pressure." (Doc. #8 at 8) ("The disabilities of her poor vision, bilateral carpal tunnel syndrome, poorly controlled blood pressure [sic]"). To the extent she meant to make the same argument regarding her blood pressure that she did regarding her carpal tunnel syndrome, it is similarly flawed. The ALJ found that her hypertension "is reasonably well controlled with medications and there is no evidence of end organ damage or any cardiac complication which would rise to the level of any impairment listed in Section 4.00." (Tr. 23, 161, 277).

[5] Exertional limitations are defined as impairments that affect a claimant's "ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling) . . . ." 20 C.F.R. §404.1569a(b).

[6] Nonexertional limitations are defined as "certain mental, sensory, or skin impairments" or

13

she must find that the limitation does not significantly reduce the occupational base of work at the applicable exertional level. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 537 (6th Cir. 1981). In other words, when the claimant has a nonexertional limitation, the ALJ must either consult a vocational expert or "demonstrate ample support in the record for the proposition that the significant nonexertional impairment at issue nonetheless only marginally reduces the occupational base." *Andrews v. Commissioner of Soc. Sec.*, 2009 WL 1505791, at *7 (E.D. Mich. May 7, 2009) (internal citations omitted). "If a non-strength impairment, even though considered significant, has the effect only of reducing [the] occupational base marginally, the Grid remains highly relevant and can be relied on exclusively to yield a finding as to disability." *Id.* at *7 (quoting *Ortiz v. Secretary of Health & Human Servs.*, 890 F.2d 520, 524 (1st Cir. 1989)); *see also Bullock v. Secretary of Health & Human Servs.*, 1990 WL 51403, at *3-4 (6th Cir. Apr. 24, 1990).

Thus, where the ALJ has included nonexertional limitations in the RFC assessment and declined to elicit VE testimony, the question becomes whether the limitations conflict with the skill requirements of the occupational base the ALJ identified as appropriate. If so, and if the nonexertional limitations in the RFC actually have a significant effect on the occupational base of jobs at a given exertional level, the ALJ's final determination of disability may not rely solely on the grids. *See Boley v. Astrue*, 2012 WL 680393, at *9 (E.D. Mich. Feb. 10, 2012) (citing *Shelman v. Heckler*, 82 F.2d 316, 321 (6th Cir. 1987)). Stated another way, "[a]t issue is whether the ALJ had substantial evidence, relying solely on the grids, to appropriately determine the existence of a significant number of jobs in the national economy that the [claimant] is able to do in light of her nonexertional limitations." *Cox v. Astrue*, 2010 WL 3120593, at *11 (W.D. Wash.

---

"impairments [which] result solely in postural and manipulative limitations or environmental restrictions." 20 C.F.R. Part 404, Subpt. P, App. 2, Section 200.00(e).

14

July 9, 2010); *see also Adkins v. Comm'r of Soc. Sec.*, 251 F. App'x 346, 350 (6th Cir. 2007) (stating the inquiry as "whether or not the government has produced substantial evidence showing that jobs exist in the national economy which Plaintiff can perform").

In this case, the ALJ concluded that Edwards has the "ability to perform work at all exertional levels," with the following nonexertional limitations: she should be required to climb ladders, ropes and scaffolds no more than occasionally (so-called "postural limitations"), and she should avoid concentrated exposure to vibration, fumes, odors, dust, gases, poor ventilation, and hazards such as machinery and heights ("environmental limitations"). (Tr. 23). Applying the grids,[7] the ALJ then concluded that "these limitations have little or no effect on the occupational base of unskilled work at all exertional levels." (Tr. 26-27). Thus, the issue is whether the ALJ's conclusion – that Edwards' nonexertional limitations do not significantly erode the base of unskilled work at all exertional levels – is supported by substantial evidence.

Because the ALJ here specifically found that Edwards could perform work at *all* exertional levels, this necessarily includes work at the heavy, medium, light and sedentary levels. Even assuming for a moment that Edwards' nonexertional limitations would somehow preclude her from performing heavy or medium work (a proposition which Edwards fails to advance), the fact remains that the ALJ still found that she can perform unskilled work at both the light and sedentary levels, despite her postural and environmental limitations. Courts have held that, by definition, certain classes of work inherently involve a number of different nonexertional limitations, such that reliance on VE testimony is unnecessary. *See, e.g., Kinney v. Sec'y of Health & Human Servs.*, 1992 WL 9026, at *1-2 (6th Cir. Jan. 22, 1992) (finding that restrictions

---

[7] Although the ALJ stated that she was using the grids as a "framework" for her analysis (Tr. 27), she did not receive vocational expert testimony, nor did she cite other specific evidence in support of her conclusion about the effect of Edwards' nonexertional limitations.

regarding stress, excessive physical strength and overtime were consistent with the demands of sedentary work such that use of the grids was proper). Moreover, applicable social security rulings – on which the ALJ appropriately relied in concluding that Edwards could perform a significant number of jobs that exist in the national economy – make clear that Edwards' nonexertional limitations do not significantly erode the occupational base of either light or sedentary work.

With respect to Edwards' postural limitations (climbing ladders, ropes, and scaffolds), Social Security Ruling ("SSR") 85-15, on which the ALJ relies, provides that where a claimant's only limitation is in climbing and balancing, such a limitation does not ordinarily have a significant impact on the occupational base. *See* 1985 WL 56857, at *6. That ruling further specifies that if a claimant can stoop, crouch, and kneel occasionally to lift objects, the light occupational base is "virtually intact." *Id.* at *7. Likewise, SSR 96-9p provides: "Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." 1996 WL 374185, at *7 (July 2, 1996). Thus, substantial evidence supports the ALJ's conclusion that Edwards' postural limitations do not significantly erode the occupational base of light or sedentary work.

Similarly, the ALJ determined that Edwards should avoid concentrated exposure to vibration, fumes, odors, dust, gases, poor ventilation, and hazards such as machinery and heights. These nonexertional limitations do not erode Edwards' ability to perform unskilled, sedentary work because "few occupations in the unskilled sedentary occupational base require work in environments with extreme cold, extreme heat, wetness, humidity, vibration, or unusual

16

hazards." *Id.* at *9; *see also* SSR 85-15, 1985 WL 56857, at *8 (finding that environmental restrictions to avoid excessive amounts of fumes, poor ventilation, noise, dust, etc. have minimal impact on the broad world of work because most job environments are not implicated by these factors).[8] Thus, substantial evidence supports the ALJ's conclusion that Edwards' nonexertional environmental limitations had little or no effect on the relevant occupational base. As a result, the ALJ was not required to obtain vocational expert testimony, and her conclusion, based on application of the grids, that Edwards is not disabled under the Act, is supported by substantial evidence.

Lastly, Edwards states in passing that "the ALJ fail[ed] to elicit any specific types of jobs that she feels claimant would be able to perform." (Doc. #8 at 7). Again, Edwards' statement in this respect is more akin to an observation than an actual legal argument; she fails utterly to identify how the ALJ's purported failure in this regard constitutes legal error warranting remand. In her motion, Edwards does not cite any law in support of the proposition that, after properly applying the grids, the ALJ also was required to identify specific jobs that she could perform. Indeed, the very purpose of the grids is to determine whether significant numbers of jobs exist for a claimant of a specific age, work experience, physical ability, and education; thus, proper application of the grids announces whether "substantial gainful work in the national economy is available for that particular individual . . . ." *Carpenter v. Commissioner of Soc. Sec.*, 2012 WL 381598, at *3 (W.D. Mich. Jan. 11, 2012) (quoting *Kirk*, 667 F.2d at 535). Edwards has cited no case law requiring the ALJ, after properly applying the grids, to specifically identify those jobs

---

[8] *See also Greggs v. Astrue*, 2010 WL 2581963, at *4 (M.D. Ala. June 22, 2010) (occupational base not significantly eroded where claimant could perform the full range of work at all exertional levels with the following nonexertional limitations: no working around moving equipment, no operating automotive equipment, no climbing ladders, ropes, and scaffolds, and no working around unprotected heights and open water.).

in the national economy that she could perform, and the court is not aware of any.[9] As such, this "argument" fails.

## III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [11] be GRANTED, Edwards' Motion for Summary Judgment [8] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: December 17, 2012					s/David R. Grand
Ann Arbor, Michigan					DAVID R. GRAND
							United States Magistrate Judge


## NOTICE

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and

---

[9] The Commissioner argues in his brief that the ALJ specifically found that Edwards could work as a cafeteria attendant, lunchroom or coffee shop attendant, or usher. (Doc. #11 at 10, *citing* Tr. 47).  The document on which the Commissioner relies, however, labeled "Explanation of Determination" in the transcript, appears to be associated with the initial denial of Edwards' application for DIB, not the ALJ's decision.  Indeed, nowhere in her decision does the ALJ reference this document, nor does she specifically identify these jobs as jobs that Edwards could perform.  While the ALJ certainly could have incorporated this finding into her decision, the court declines to uphold her conclusion on that basis, as the Commissioner's "post hoc rationalization at this stage is insufficient." *Beckrow v. Commissioner of Soc. Sec.*, 2012 WL 1564669, at *12 (E.D. Mich. Apr. 12, 2012) (internal quotations omitted).

Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objections must be served upon this Magistrate Judge.  E.D. Mich. LR 72.1(d)(2).

Each objection **must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains.  Not later than fourteen (14) days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 17, 2012.

                s/Felicia M. Moses
                FELICIA M. MOSES
                Case Manager